UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------- X

AHMAD SINGER,

                      Plaintiff,

         -against-

NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION and DAVID
BAKSH,

                 Defendants.

----------------------------------------------------------- X

**MEMORANDUM DECISION
AND ORDER**

18-cv-6356 (BMC)

**COGAN**, District Judge.

       Plaintiff, a former administrator for New York City Health and Hospitals Corporation ("NYCHH"), brings this action alleging he was subjected to discrimination due to his race, national origin, and religion; a hostile work environment; and retaliation when his employer terminated him as part of a reduction in force. His claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq*. ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq*. ("NYCHRL"). Defendants, his former employer and colleague, have moved for summary judgment. There is no basis for plaintiff's discrimination, hostile work environment, and retaliation claims under federal and state law, and I therefore grant summary judgment dismissing those claims. I decline to exercise supplemental jurisdiction over plaintiff's remaining claims under NYCHRL.

## BACKGROUND

The following materials facts are taken from defendants' Local Rule 56.1 statement and plaintiff's admissions in response.

Plaintiff began working at Queens Hospital Center ("QHC") as an Associate Director in August 2007, serving as an administrator at the city hospital within NYCHH's health system. A Muslim of Lebanese descent, he self-identifies as Middle-Eastern. He was originally hired by Joan Gabriele, QHC's Chief Nursing Officer ("CNO"), who became his direct supervisor. Throughout his tenure, plaintiff received a number of promotions and pay increases, and Gabriele was involved in all of these career-enhancing milestones.

Plaintiff lodged a complaint of a threat of workplace violence with the hospital's police department and Workplace Violence Coordinator in December 18, 2013. The allegation arose from an ongoing feud between plaintiff and a QHC colleague, defendant David Baksh. For starters, the two had a professional disagreement over the responsibilities of their respective departments, which soured their relationship and led to Baksh mentioning to others that plaintiff wouldn't last long in the organization. In early 2013, plaintiff was approached at work by Baksh, who said to plaintiff, "If I wanted to get you … you would know it because I would hurt and destroy you." Later, in August 2013, Baksh made a comment about "terrorism" at a work-place safety meeting, turned to plaintiff and said, "No offense." A few months later, in December 2013, Baksh made a hand gesture during a group meeting in which he simulated cutting his own neck and looked at plaintiff, insinuating that he was going to hurt him. This final incident prompted plaintiff to make the report of workplace violence. Baksh did not supervise plaintiff or have any input into his evaluations.

At his deposition, plaintiff testified that the last time Baksh had ever made any discriminatory or harassing comments to him was the December 2013 throat-slashing incident. Plaintiff was then asked to describe the next time Baksh discussed plaintiff's race, religion, or national origin.  He denied any subsequent occurrences, stating "[n]o. There was nothing." Defendants' counsel inquired once more, asking "are there any instances that we haven't talked about where Baksh referenced you in a discriminatory or harassing manner."  Plaintiff again responded in the negative.[1]

In 2014, plaintiff was promoted to the position of Associate Executive Director ("AED"). As a senior manager, he was responsible for the direction, coordination, and control of the operational activities of Nursing Services in the Emergency Services, Perioperative Services, Radiology and the Cancer Center, and Cardiac Rehabilitation units, supervising about 240 employees.  He provided administrative supervision to his direct reports, who, in turn, were responsible for the day-to-day administration of each of the service lines under his supervision.

By 2017, QHC, along with other medical facilities throughout NYCHH's health system, underwent a reduction in force in response to increasing financial challenges.  As part of this restructuring, a seven-member committee comprised of QHC and NYCHH senior leadership was convened, which included the CNO and QHC's Chief Executive Officer, Christopher Roker. The committee was charged with reviewing QHC's managerial positions to determine which positions were non-essential and could therefore be eliminated to reduce the hospital's budget. Baksh did not sit on the panel.  As a result of the reduction in force, seven managerial positions

---

[1] In opposition to the instant motion, plaintiff submitted an affidavit in which he specifically recalled Baksh regularly making discriminatory comments about plaintiff's race, nationality, and religion well after the December 2013 incident, stating the abuse and harassment continued until plaintiff's June 2017 termination. This affidavit is addressed below.

3

at QHC were eliminated in February 2017, and more than fifty managerial positions were eliminated by June 2017.  The second wave of eliminations included plaintiff's position, along with two other AEDs positions.  Upon plaintiff's termination, his duties were subsumed by lower-level managers, and no one was hired to backfill plaintiff's eliminated AED role.

Before he was fired, in January and April of 2017, plaintiff had two one-on-one meetings with the hospital's CEO, who disclosed to plaintiff that he used to work with an individual "like" plaintiff named "Sameer."  Roker stated to plaintiff that he initially had difficulties working with Sameer due to interpersonal and communication issues.  He explained that it took some time before he was finally able to "understand" and "work it out" with Sameer.  Based on these comments, plaintiff was left with the distinct impression that Roker believed individuals of Middle Eastern descent, like plaintiff, had emotional intelligence issues.

On June 2017, plaintiff was informed that he was being terminated by the hospital effective immediately due to business necessity and the organizational realignment.  It was conveyed to him that the decision to eliminate his position was made to create a more efficient, streamlined, and financially sustainable management team.  He was also told that his position would not be backfilled.

Plaintiff then filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 2017.  It alleged that the elimination of plaintiff's position was based on his race, religion, and national origin.  The date range provided for the alleged discrimination was from April 2017 through June 2017.  Plaintiff attached a seven-page sworn declaration recounting how he was subjected to disparate treatment because his position was deemed "non-essential" despite his "unmatched" credentials and "superior" evaluations and

4

when four non-Muslim, non-Lebanese AEDs were not fired.  He received a right to sue letter

from the EEOC on September 2018.

## DISCUSSION

### I.

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment when

"the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  "Where the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation

marks omitted).

A dispute as to a material fact is "'genuine' … if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  The opposing party must put forward some "concrete evidence from which a

reasonable juror could return a verdict in his favor" to withstand a motion for summary

judgment.  Id. at 256.  "Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether

he is ruling on a motion for summary judgment or for a directed verdict."  Id.  When deciding a

motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor."  Id. (internal quotation mark omitted).

### II.

Plaintiff's Title VII and NYSHRL discrimination claims are governed by the familiar

burden-shifting test from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).  See

Vargas v. Morgan Stanley, 438 F. App'x 7, 9 (2d Cir. 2011).  At step one, plaintiff must make out a *prima facie* case by showing that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that gives rise to an inference of discrimination.  See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93 (2d Cir. 2010).  At step two, a defendant must "articulate some legitimate, nondiscriminatory reason for its action," but "need not persuade the court that it was actually motivated by the proffered reason."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 168 (2d Cir. 2014) (internal quotation marks omitted).  At step three, the burden shifts back to the plaintiff to show "that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."  Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013).

Plaintiff was the only Lebanese and Muslim AED who was terminated during the reduction in force in June 2017. He contends a *prima facie* case of discrimination exists because four non-Lebanese, non-Muslim AEDs were not fired, even though he had "superior" evaluations.  A *prima facie* case of discrimination requires a *de minimis* showing.  Green v. Town of East Haven, 952 F.3d 394, 404 (2d Cir. 2020).  I will therefore assume, for the purposes of defendants' motion, that plaintiff has carried his initial burden of showing a *prima facie* case of discrimination.[2]

Moving to the second step of McDonnell-Douglas, plaintiff's employer has satisfied its burden of showing legitimate, non-discriminatory reasons for his termination.  It is undisputed

---

[2] See Sattar v. Johnson, 129 F. Supp. 3d 123, 138 (S.D.N.Y. 2015) ("Second Circuit case law makes clear that the court may simply assume that the plaintiff has established a *prima facie* case and skip to the final step in the McDonnell Douglas analysis as long as the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action"), aff'd, 669 F. App'x 1 (2d Cir. 2016); Ramos v. Piller, Inc., No. 07-cv-4047, 2009 WL 3401261, at *4 (S.D.N.Y. Oct. 21, 2009) ("an increasing number of courts in this Circuit presume that plaintiffs have sufficiently presented a *prima facie* case in discrimination suits.") (collecting cases).

that NYCHH went through a system-wide organizational realignment and reduced management

positions, resulting in QHC eliminating 57 managerial positions in 2017.  A *bona fide* reduction

in workforce is a legitimate, non-discriminatory reason for terminating an employee.  See

Quarless v. Brooklyn Botanic Garden Corp., 611 F. App'x 28, 29–30 (2d Cir. 2015) (that

employer was in "financial distress and adopted cost-saving measures including an organization-

wide reduction-in-force" was legitimate reason for the plaintiff's termination).

Now that the presumption of discrimination has vanished, the burden shifts back to

plaintiff to "persuad[e] the court that a discriminatory reason more likely motivated the employer

or … to show[] the defendant's explanation is unworthy of credence."  See Texas Dep't of Cmty.

Affairs v. Burdine, 450 U.S. 248, 256 (1981).  "A discrimination claimant may show pretext by

demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did

not act for the asserted non-discriminatory reasons."  Brierly v. Deer Park Union Free Sch. Dist.,

359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005) (citations and internal quotation marks omitted).

In an effort to show pretext, plaintiff presents the following arguments: (1) he opines that

he was the "most qualified" AED by virtue of his experience, education, and certifications and

that he consistently received positive evaluation; (2) the employer's less favorable treatment of

plaintiff compared to similarly situated persons outside his protected groups; (3) the hospital's

explanation that his position was "non-essential" was implausible because four employees had to

assume his duties; and (4) the CEO's remarks suggest discriminatory *animus*.

No reasonable jury could infer from this evidence that the employer's reason for firing

plaintiff was substantially motivated by unlawful discrimination.  Plaintiff's "stellar" job

performance is irrelevant to the Court's pretext inquiry because his employer never cited his personal competence or qualifications as a basis for his termination or for distinguishing "essential" from "non-essential" positions.  See Pleau v. Centrix, Inc., 343 F. App'x 685, 688 (2d Cir. 2009) (deeming allegation that work performance evaluations were falsified as irrelevant to the pretext inquiry because the defendants never cited plaintiff's job performance as a basis for his termination).

Rather, defendants have consistently maintained that the committee's selection of certain positions was *not* a reflection of the performance of the individual managers themselves, but settled after considering factors such as best practice models; patient volume; size of the facility; and, significantly, whether excess layers of management existed within a unit such that a manager's responsibilities could be readily absorbed by existing staff members.  Neglecting to address these factors, plaintiff has failed to show how the hospital's proffered explanation is unworthy of credence or has been inconsistent.  Thus, plaintiff's reliance on his evaluations cannot carry his ultimate burden of providing evidence upon which a reasonable jury could find in his favor.

As to plaintiff's disparate treatment argument, the four AEDs are not proper comparators.  To be "similarly situated," the individuals with whom plaintiff attempts to compare himself must be similarly situated in all material respects.  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997).  Based on plaintiff's deposition and his sworn declaration attached to his EEOC charge, it is plain that plaintiff and the alleged comparators' duties and responsibilities were quite dissimilar – they were in charge of separate medical departments within the hospital and supervised a different number of subordinates.[3]  Although plaintiff supervised almost 240

---

[3] Ms. Elivert's primary focus was on patient experience, and she only had 2 or 3 subordinates.  Ms. Harvey was in charge of behavior health in the nursing department, psychiatry, and the Critical Care and Medical Surgical units,

employees, three out of the four AEDs supervised a fraction of this amount.  The only AED who had a comparable number of subordinates, Ms. Harvey, supervised a completely different department, and plaintiff even stated in his sworn EEOC declaration that "the scope of [his] responsibilities far exceeded those of [Harvey]."

The number of employees supervised by a manager, such as an AED, was a material factor in the committee's ultimate determination that plaintiff's position was non-essential compared to the other AED positions.  The greater number of subordinates throughout multiple units naturally meant that there were excess layers of managers beneath plaintiff who were already completing the day-to-day administration under his supervision.  Accordingly, his subordinates had the capacity and capability to readily absorb his duties and ensure continuity upon plaintiff's departure.  Put bluntly, his position was deemed redundant and thus expendable. Plaintiff has presented neither evidence nor argument suggesting that the other AEDs' responsibilities could have also been so readily assumed by their respective subordinates had these positions been eliminated.

In fact, the only commonalities plaintiff states he shared with the four AEDs were that they all held the same job title and provided "administrative oversight" for their respective departments.  Such generalities are insufficient to brand employees as "similarly situated."  See Roa v. Mineta, 51 F. App'x 896, 899 (2d Cir. 2002) (affirming summary judgment where the plaintiff and alleged comparable held materially different duties and responsibilities); Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 368 (S.D.N.Y. 2006), aff'd, 629 F.3d 276 (2d Cir. 2010) (although employees shared "manager" title, alleged comparables were not similarly situated

---

supervising between 200 to 300 employees.  Ms. Magnaye-Banzon was in charge of obstetrics and gynecology, neonatal, and ambulatory services and supervised around 100 employees.  Ms. Beaudouin was in charge of in-service nursing education and supervised only 11 employees.

because they worked in different fields within the company and held different duties and responsibilities).

In addition, plaintiff's personal disagreement with his employer's business judgment that his position was non-essential compared to the other AEDs is insufficient to show pretext.  See Stanojev v. Ebasco Servs., Inc., 643 F.2d 914, 921–22 (2d Cir. 1981) (reasoning a management-level employee may be discharged "on the basis of subjective business judgment, for any reason that is not discriminatory").  The Second Circuit has noted that, although a court "must ensure that employers do not act in a discriminatory fashion," it should "not sit as a super-personnel department that reexamines an entity's business judgment."  Delaney, 766 F.3d at 169; see also Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 411 (7th Cir. 1997) ("It is not [the court's] province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for that plaintiff's termination.").  As noted above, plaintiff's position was deemed non-essential partially based on the redundancy of the position under the new healthcare model and because of the excess layers of lower-managerial staff members.  Plaintiff has presented no evidence, beyond his own personal disagreement, that his position was more "essential" than the other AEDs based on the factors considered by the committee.

There is another undisputed fact that shows why plaintiff cannot meet his burden at step 3 of McDonnell-Douglas – the CNO, who sat on the committee that determined plaintiff's position to be non-essential, hired and promoted plaintiff, awarded him "stellar" evaluations, and provided him with positive letters of recommendations throughout his tenure.  Many cases have recognized the logical conclusion that when the same manager who hired and promoted the employee was in favor of his termination, that tends to dispel any inference of discriminatory motive.  See, e.g. Inguanzo v. Hous. & Servs., Inc., 621 F. App'x 91, 92 (2d Cir. 2015).

Plaintiff also advances the peculiar argument that discrimination can be inferred because it took four subordinates to assume his responsibilities, claiming this demonstrates how "complex" and "essential" his position was to the organization.  But I see that fact as leading only to the opposite conclusion.  Not only does this corroborate QHC's explanation that plaintiff's duties were redundant and could readily be absorbed by lower-level managers formerly under plaintiff's watch, but the fact that no one was hired to backfill plaintiff's position further supports granting summary judgment in favor of defendants.  See Roge v. NYP Holdings, Inc., 257 F.3d 164, 170 n.2 (2d Cir. 2001).

Finally, Roker's comments about his difficulties in getting along with someone sharing plaintiff's ethnic background is insufficient because "stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination[.]" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001).  Only "when 'other indicia of discrimination are properly presented, [will] the remarks … no longer be deemed 'stray,' and [will] the jury [have] a right to conclude that they bear a more ominous significance.'"  Id. (quotation omitted).

The Second Circuit has adopted the following framework in determining whether a remark is probative of discrimination, as opposed to a stray remark, considering four factors: (1) who made the remark; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).  Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149–50 (2d Cir. 2010).

In the present case, although Roker was obviously a decision-maker, the timing of his statements makes them non-probative of discrimination.  The two conversations occurred months

11

before plaintiff's position was eliminated.  This cuts against an inference of discriminatory intent.  See Osuan v. City of New York, No. 18-cv-151, 2019 WL 2544866, at *2 (S.D.N.Y. June 20, 2019) (supervisor's remark two months before termination insufficient to suggest discriminatory motive); Callistro v. Cabo, No. 11-cv-2897, 2013 WL 322497, at *7 (S.D.N.Y. Jan. 25, 2013) (declaring comments not probative of discrimination when made "at least one month" before any discussion of plaintiff's termination began).

Nor does the context and content of Roker's comments suggest that they were related in any way to the decision to eliminate plaintiff's position.  His remarks were made during meetings plaintiff in fact had requested with Roker, and the comments pertained to the importance of emotional intelligence in the workforce.  Roker shared a personal anecdote on how he was able to "work out" a misunderstanding between himself and a former colleague who shared plaintiff's ethnic background.[4]  The discussion never touched upon plaintiff's future at the hospital.  After Roker's comments, plaintiff continued to work for the hospital until a committee comprised of seven individuals, including Roker, determined that over fifty managerial positions, including three AEDs, had to be cut in June 2017.  There is no way to construe Roker's relating of this anecdote other than as an attempt at bonding, not division, even if plaintiff considered the effort clumsy or insensitive.

Beyond plaintiff's pure speculation, there is nothing in the record suggesting that Roker's alleged perception of plaintiff's lack of emotional intelligence influenced the panel's decision to select his position for elimination during the *bona fide* reduction in force.  Because the totality of

---

[4] Plaintiff's feeling and belief that the "real reason" for these meetings was to convince him to stop complaining about Baksh's discriminatory behavior does not constitute admissible evidence.  See Williams v. All. Nat'l Inc., No. 98-cv-7984, 2001 WL 274107, at *5 (S.D.N.Y. Mar. 19, 2001), aff'd, 24 F. App'x 50 (2d Cir. 2001) (quoting Campbell v. All. Nat. Inc., 107 F. Supp. 2d 234, 244 n.5 (S.D.N.Y. 2000)).  At his deposition, plaintiff conceded that he lacked personal knowledge whether Roker was even aware of plaintiff's complaints about Baksh.  See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

the circumstances do not suggest discrimination, no reasonable jury could infer from Roker's

stray remarks alone that the committee's decision, which came months after these conversations,

was motivated in whole or in part by discriminatory *animus*.  See O'Connor v. Viacom

Inc./Viacom Int'l Inc., 104 F.3d 356 (2d Cir. 1996) ("Stray workplace remarks, without a clearly

demonstrated nexus to the adverse employment action at issue, do not alone suffice to defeat a

motion for summary judgment."); Sethi v. Narod, 12 F. Supp. 3d 505, 543 (E.D.N.Y. 2014)

("Where remarks are unrelated to a decision taken with respect to a plaintiff, they are not

probative of discriminatory intent.").

At bottom, the only "evidence" plaintiff provides of discrimination is mere speculation

and subjective belief of his importance to the organization.  His reasoning boils down to this: "I

am (fill in the protected class of which the plaintiff is a member); something bad happened to me

at work; therefore the bad thing happened because I am (fill in the protected class)."  Ochei v.

The Mary Manning Walsh Nursing Home Co., No. 10-cv-2548, 2011 WL 744738, at *3

(S.D.N.Y. March 1, 2011).  "As the Second Circuit and other courts of appeal have repeatedly

stated, this is a false syllogism, one that does not support any inference of discrimination."  Id.

Plaintiff's employer has proffered a legitimate, non-discriminatory rationale for his

termination, which plaintiff did not rebut.  Accordingly, I grant defendants' motion for summary

judgment on plaintiff's Title VII and NYSHRL discrimination claims.

### III.

Summary judgment in favor of defendants is also warranted as to plaintiff's hostile work

environment claims under Title VII and NYSHR for three reasons.  First, they are time-barred.

Second, plaintiff failed to exhaust his administrative remedies before pursing his federal claim.

Third, his evidence in insufficient to permit a reasonable jury to find a hostile work environment.

Title VII's exhaustion provision requires that a claimant file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act.  See 42 U.S.C. § 2000e-5(e)(1); McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010).  The statute of limitations for plaintiff's hostile work environment claim under NYSHRL is three years.  See N.Y. C.P.L.R. § 214(2); Russo v. New York Presbyterian Hosp., 972 F. Supp. 2d 429, 445 (E.D.N.Y. 2013).  Untimely filed charges are time-barred.  See Gomes v. Avco Corp., 964 F.2d 1330, 1332–33 (2d Cir. 1992).

Plaintiff filed his notice of charge with the EEOC on December 17, 2017, and therefore the limitations period began on February 17, 2017.  However, the basis for plaintiff's hostile work environment claims in this action derive entirely from the harassing and abusive behavior by Baksh from 2012 through 2013.  At his deposition, plaintiff testified that his feud with Baksh culminated in a December 2013 report of workplace violence to hospital authorities.  Plaintiff answered "no" after being asked if there were any other inappropriate occurrences.  Later in his deposition, when asked once more to confirm that all of Baksh's harassment and abuse had been covered by his testimony, plaintiff reaffirmed that there were no further allegations to discuss.  Therefore, plaintiff's hostile work environment claims under federal and state law are untimely because his EEOC complaint was lodged almost four years after the last incident in December 2013.

In an attempt to salvage these claims and create an issue of fact, plaintiff has submitted an affidavit in opposition to the instant motion in which he claims to now recall an incident from August 2015 when Baksh again called him a "terrorist" and alleged that this harassment continued until plaintiff's termination in June 2017.  But it is axiomatic that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion

14

that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  The reason for this common sense rule is to discourage after-the-fact dissembling and encourage a litigant to prepare and reflect upon his claim prior to his deposition.  Although Federal Rule of Civil Procedure 30(e) permits a deponent to indicate changes to his testimony within 30 days of his deposition, plaintiff did not seek to clarify his testimony for over three months.  I am therefore disregarding plaintiff's belated allegations because they are irreconcilable with his earlier deposition in which he clearly testified that there were no further incidents between he and Baksh after December 2013.[5]

In addition, the hostile work environment claim under Title VII is unexhausted.  A court may hear only those Title VII claims "that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which are 'reasonably related' to that alleged in the EEOC charge." Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993) (citation omitted), superseded by statute on other grounds.  "The central question is whether the complaint filed with the EEOC gave the agency adequate notice to investigate discrimination on both bases." Williams v. New York City Hous. Auth., 458 F.3d 67, 69 (2d Cir. 2006) (internal quotation marks and citation omitted).

The Second Circuit has recognized that "[h]ostile environment claims are different in kind from discrete acts." Mathirampuzha v. Potter, 548 F.3d 70, 76 (2d Cir. 2008) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002)).  Accordingly, courts in this Circuit

---

[5] The affidavit of Michael Valentino does not help plaintiff.  Valentino notes generally that he "continually witnessed Baksh harass plaintiff," but the only specific dates and instances he describes are plaintiff's time-barred claims from 2012 and 2013.  Valentino never once states that he witnessed a discriminatory or abusive incident after December 2013 in which plaintiff's race, national origin, or religion was referenced.

have consistently held that "allegations in the EEOC charge [that] relate solely to several discrete instances of alleged discrimination or retaliation … are insufficient to exhaust a hostile work environment claim." Bastie v. Batiste v. City Univ. of New York, No. 16-cv-3358, 2017 WL 2912525, at *6 (S.D.N.Y. July 7, 2017). To properly exhaust such a claim, "a plaintiff must actually allege a hostile work environment claim in his EEOC Charge." Khater v. API Indus., Inc., No. 16-cv-6695, 2017 WL 6515531, at *3 (S.D.N.Y. Dec. 19, 2017); see also Wright v. New York City Off-Track Betting Corp., No. 05-cv-9790, 2008 WL 762196, at *3 (S.D.N.Y. March 24, 2008) (the mere articulation of disparate treatment or race discrimination on an adverse employment action theory "will not exhaust a hostile work environment claim").

In his EEOC charge alleging discrimination under Title VII, plaintiff attached a seven-page document in which he described in great detail the accusation that his 2017 termination was fraught with race, national origin, and religious discrimination. Specifically, he contended his qualifications and experience surpassed those of the four non-Muslim and non-Lebanese AEDs who were not fired. Noticeably absent from the EEOC charge, however, was any suggestion of a hostile work environment, harassment, or abuse by Baksh or anyone else for that matter. Plaintiff also provided a narrow date range in the charge (April 2017 through June 2017), a timeframe that didn't cover Baksh's inappropriate behavior from 2012 and 2013. Consequently, because the discriminatory termination and hostile work environment claims are distinct legal theories perpetrated by different actors and remote in time, the federal hostile work environment claim arising from Baksh's behavior should have been included in the EEOC charge. See Szuszkiewicz v. JP Morgan Chase Bank, 12 F. Supp. 3d 330, 341 (E.D.N.Y. 2014).

Even putting untimeliness and exhaustion aside, plaintiff's Title VII and NYSHRL hostile work environment claims do not survive summary judgment on their merits.[6]  To establish a claim of hostile work environment, a plaintiff must show discriminatory conduct that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).  The Supreme Court has identified four factors to consider in determining whether harassing conduct is sufficiently severe or pervasive to alter an employee's terms or conditions of employment: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or a mere offensive utterance; and (4) whether it unreasonably interfered with an employee's work performance.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993).

 The allegations in the instant case fail to satisfy the "pervasiveness" standard.  To cross this threshold, the offending incidents must be "more than episodic" and "sufficiently continuous and concerted in order to be deemed pervasive."  Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015).  Plaintiff's four objectionable interactions with a co-employee over the course of approximately eighteen months cannot as a matter of law be "pervasive".  See Paul v. Postgraduate Ctr. for Mental Health, 97 F. Supp. 3d 141, 182–83 (E.D.N.Y. 2015) (collecting cases that agree that "five [occurrences] over the course of roughly fourteen months … [is] a rate of occurrence which courts [in the Second Circuit] have found to be infrequent.").

It is true that pervasiveness is not the only way to demonstrate a hostile work environment.  Where there is a lack of pervasiveness, the allegations of harassment must be "extraordinarily severe" for a plaintiff to raise an issue as to a hostile work environment.  See

---

[6] Both are governed by the same standard.  See Summa v. Hofstra Univ., 708 F.3d 115, 123–24 (2d Cir. 2013).

Kaytor v. Elec. Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010).  However, no reasonable jury could find that three inappropriate comments and an arguably offensive gesture by a non-supervisory co-employee were so "extraordinarily severe" as to constitute a hostile work environment.  The "slitting of the throat" gesture from December 2013 occurred during a meeting with other colleagues present.  It wasn't an explicit threat, but plaintiff merely stated it was "insinuated" as one.  There was no physical contact between the two, and although plaintiff did file a report of workplace violence the same day, he continued to work at the hospital for three and a half years.  He continued to receive "stellar" evaluations and promotions and pay increases, and he did not request any further intervention or accommodations from his direct supervisor due to Baksh's conduct.  More importantly, there were no further incidents between the two.

Such isolated comments and asinine behavior are not the sort of "extraordinarily" or "egregious" incidents that may transform workplace conditions into a hostile work environment.  C.f., Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995) (even a single incident of sexual assault may sufficiently alter the conditions of employment), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).  Accordingly, courts within this Circuit have granted summary judgment for defendants in cases involving comparable offensive conduct.  See, e.g., Fleming v. MaxMara USA, Inc., 644 F. Supp. 2d 247, 253–54 (E.D.N.Y. 2009), aff'd, 371 F. App'x 115 (2d Cir. 2010) (insufficient evidence of racial hostile work environment despite supervisor's comment that "one day we are going to come in and there's going to be a rope hanging from the ceiling and guess who is going to be hanging from it"); Sattar, 129 F. Supp. 3d at 142–44 (asking plaintiff "[a]re those terrorists your cousins?" in reference to recent terrorist attack, and supervisor's pantomimed shooting of an imaginary gun at

18

the plaintiff insufficiently severe or pervasive to alter conditions of the plaintiff's employment);

Kaur v. New York City Health & Hosps. Corp., 688 F. Supp. 2d 317, 338 (S.D.N.Y. 2010)

(holding offensive comments that "I know where you are from … [y]ou eat s--t and holy cow"

and that Indians "sell their daughters," "eat cows," and "never tell the truth and lie," was

insufficiently severe to alter the terms and conditions of the plaintiff's employment).  The same

result is required here.

## IV.

With respect to plaintiff's retaliation claims, plaintiff has again failed to exhaust his

administrative remedies.  "The scope of an EEOC investigation cannot reasonably be expected to

encompass retaliation when [plaintiff] failed to put [the EEOC] on notice that [he] had engaged

in the type of protected activity that is the predicate to a retaliation claim."  O'Hara v. Mem'l

Sloan-Kettering Cancer Ctr., 27 F. App'x 69, 70 (2d Cir. 2001) (citing Fitzgerald v. Henderson,

251 F.3d 345, 366 (2d Cir. 2001)).

Here, there was no factual or legal nexus between the substance of the allegations in

plaintiff's EEOC charge and his retaliation claims.  Plaintiff's seven-page declaration to his

EEOC charge omitted any reference to Baksh, any harassment or abuse, any formal or informal

complaints or activities, dates within 2012 and 2013, or even that plaintiff was subjected to

retaliation.  Rather, it only alleged discrimination by the hospital when plaintiff's position was

eliminated in 2017.  Because there were no overlapping facts, perpetrators, or legal theories,

plaintiff's Title VII retaliation claim – a substantively distinct theory from his race, national

origin, and religion discrimination claims – remains unexhausted.  See id. ("Retaliation is a

theory of liability that is substantively distinct from [the plaintiff's] discrimination claim."); see

also Morris v. David Lerner Assocs., 680 F. Supp. 2d 430, 437–38 (E.D.N.Y. 2010) ("[A]

retaliation claim is not 'reasonably related' to the EEOC charge simply because the EEOC charge refers to the fact that plaintiff suffered an adverse employment action, such as termination.") (collecting cases).[7]

In any event, plaintiff's retaliation claims under federal and state law fail on the merits. The applicable standard for proving retaliation under Title VII and NYSHRL is adapted from and thus similar to the burden shifting test established in McDonnell Douglas Corp., 411 U.S. at 802–05, discussed above.  First, to establish a *prima facie* case of retaliation, the plaintiff must:

> adduce evidence sufficient to permit a rational trier of fact to find (1) that he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 205–06 (2d Cir. 2006).  Upon such a showing, the employer must articulate legitimate non-discriminatory reasons for its actions.  If it does so, the plaintiff bears the burden of showing that the employer's explanations are pretextual for the true discriminatory motive.  See Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 130 (2d Cir. 1996).

Here, the timing of the protected activity in relation to the adverse employment action fails to suggest a *prima facie* case for retaliation.  After plaintiff filed a complaint of workplace violence in December 2013, he did not suffer any adverse employment action until July 2017. But "[r]etaliatory intent does not sit patiently like a spider in a web hoping that prey will wander in; the daily employment relationship provides for constant opportunities and temptations to retaliate for protected activity if an employer is of a mind to do so."  Birch v. City of New York,

---

[7] Although one is required to exhaust a Title VII retaliation claim, there is no such obligation under NYSHRL.  See Ross-Caleb v. City of Rochester, 512 F. App'x 17 (2d Cir. 2013).  In any event, Baksh cannot be held individually liable under Title VII.  See Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012).

184 F. Supp. 3d 21, 32 (E.D.N.Y. 2016).  Thus, the four-year gap between the two events cannot

give rise to an inference of retaliation.  See, e.g., Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268,

273 (2001) (noting that the two events must be "very close," and that a proximity of three

months or more is insufficient); Dixon v. Int'l Fed'n of Accountants, 416 F. App'x 107, 110–11

(2d Cir. 2011) (proximity of four months insufficient).

Even if plaintiff could establish a *prima facie* case of retaliation, his employer has

articulated a legitimate, non-retaliatory reason for plaintiff's termination.  As noted above, it is

undisputed that the hospital went through a system-wide organizational realignment and reduced

management positions, resulting in the elimination of 57 managerial-level positions in 2017.  See

Quarless, 611 F. App'x at 29–30.  After plaintiff's termination, he was not replaced by a new

hire, but several former colleagues assumed his previous responsibilities.

Because defendants presented a non-retaliatory, legitimate reason for plaintiff's

termination, plaintiff had to present at least some evidence that defendants' actions were

motivated, at least in part, by a desire to retaliate against him.  In an attempt to show pretext,

plaintiff advances four familiar arguments: (1) that Baksh continued to harass plaintiff from 2014

through July 2017 and that plaintiff made numerous complaints about this misconduct in the

months leading up to his termination; (2) that in January and April of 2017, Roker attempted to

convince plaintiff to stop complaining about Baksh's discriminatory behavior; (3) that he was

subjected to disparate treatment compared to the AEDs outside his protected groups; and (4) that

his position was eliminated during the reduction in force, despite plaintiff being the "most

qualified" AED by virtue of his experience, education, and evaluations.

These contentions fail to satisfy plaintiff's burden for the same reasons I stated above in

granting defendants' motion as to the discrimination claims.  To reiterate, I am disregarding

21

plaintiff's claims that there was subsequent harassment and abuse by Baksh after December 2013 and that he complained about these incidents from 2014 through 2017.  He testified to the opposite at his deposition.  See Hayes, 84 F.3d at 619.  I am also discounting plaintiff's speculative opinion that Roker's "real reason for [the one-on-one] meetings" was to convince plaintiff to stop complaining about Baksh's discriminatory behavior.  Plaintiff testified at his deposition that neither Baksh nor plaintiff's complaints were ever raised at these meetings and that it was actually plaintiff who requested the meetings with Roker.  In addition, plaintiff conceded that he was purely speculating as to Roker's knowledge of plaintiff's complaint about Baksh and therefore plaintiff's feeling and belief is inadmissible.  See Williams, 2001 WL 274107, at *5.

Plaintiff was also not similarly situated in all material respects to the four remaining AEDs because they were in charge of separate medical departments within the hospital; their duties and responsibilities were different; plaintiff's responsibilities "far exceeded" those of the only AED who supervised a similar number of subordinates; and plaintiff's position had excess layers of management beneath him so his former responsibilities could be readily absorbed by existing staff, thereby ensuring continuity.  Plaintiff didn't present any evidence or argument that similar levels of capable lower-managerial staff existed beneath the other AEDs.  Lastly, plaintiff's job performance and evaluations are irrelevant to the Court's pretext inquiry because these were never cited as bases for selecting his AED position for elimination during the reduction in force process.  See Pleau, 343 F. App'x at 688.

Plaintiff has therefore failed to present evidence suggesting that the hospital's justification for his termination was pretext for unlawful retaliation, and defendants' summary judgment motion as to the retaliation claims under Title VII and NYSHRL is granted.

**V.**

Under 28 U.S.C. § 1367(c), a district court may "decline to exercise supplemental jurisdiction over a claim" if the district court "has dismissed all claims over which it has original jurisdiction."  The Supreme Court has directed that, except in unusual circumstances, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).  Dismissal of the state claims avoids "[n]eedless decisions of state law," which "should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  Id.

Thus, "[t]he strong preference in this Circuit is for district courts to decline to exercise supplemental jurisdiction under § 1367(c)(3) when all of the federal claims are dismissed from the suit prior to trial."  Schiffman v. Epstein, No. 04-cv-2661, 2009 WL 1787760, at *7 (S.D.N.Y. June 23, 2009).  When the federal claims are dismissed before trial, courts should only retain supplemental jurisdiction in unusual circumstances, including "when the remaining state law claims are linked to unique federal interests, when dismissal of the federal claims comes days before the commencement of trial, when the court has expended significant time in discovery and dispositive motion practice prior to dismissal of the federal claims, and when the state law claims do not present novel questions of state law."  Id.

Having disposed of all the federal claims in this case before even scheduling trial, I decline to exercise supplemental jurisdiction over the remaining NYCHRL claims.  The Court's prior involvement in this case does not weigh in favor of retaining supplemental jurisdiction. The Court has had only minimal involvement in discovery, and there has been no motion practice in this case besides the instant motion.

Further, the NYCHRL claims raise different legal issues than the federal claims because "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (internal quotation mark and citations omitted).  For this reason, courts regularly decline to exercise supplemental jurisdiction over NYCHRL claims once the federal claims are dismissed.  See Johnson v. DCM Erectors, Inc., No. 15-cv-5415, 2016 WL 407293, at *3 (S.D.N.Y. Feb. 2, 2016) (collecting cases).

## CONCLUSION

Defendants' [20] motion for summary judgment is granted.  The Clerk is directed to enter judgment, dismissing plaintiff's Title VII and NYSHRL claims with prejudice, and his NYCHRL claims without prejudice.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
         June 2, 2020